*Formatted for Electronic Distribution*                                    *For Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

Filed & Entered
On Docket
April 3, 2015

In re:

    **David Kadoch,**　　　　　　　　　　　　　　**Chapter 7 Case**
         **Debtor.**　　　　　　　　　　　　　　　　**# 14-10552**

_____

| | |
|---|---|
| *Appearances:* *Jennifer Emens-Butler, Esq.* | *John Canney, III, Esq.* |
| *Obuchowski & Emens-Butler* | *Rutland, Vermont* |
| *Bethel, Vermont* | *Chapter 7 Case Trustee* |
| *For the Debtor* | *Pro Se* |
| | |
| *James Anderson, Esq.* | *Jess Schwidde, Esq.* |
| *Ryan, Smith & Carbine* | *Glinka & Schwidde* |
| *Rutland, Vermont* | *Rutland, Vermont* |
| *For Creditor Laurie Kadoch* | *For Creditor Esther Clenott* |

## MEMORANDUM OF DECISION
### OVERRULING CREDITORS' OBJECTIONS TO DEBTOR'S HOMESTEAD EXEMPTION

Two creditors in this case, Laurie Kadoch, the Debtor's former spouse, and Esther Clenott, the Debtor's former mother-in-law, have filed objections to the Debtor's claim of a homestead exemption in his current residence at 2024 Main Street, Quechee, Vermont. Specifically, the creditors argue the Debtor is not entitled to claim a homestead exemption in this property, and even if he is, the Debtor's homestead exemption does not bar Ms. Clenott's enforcement of a claim for money she loaned to the Debtor and his then spouse to renovate the Main Street property. For the reasons set forth below, the Court overrules the creditors' objections.

### JURISDICTION

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered by Chief Judge Christina Reiss on June 22, 2012.

The Court declares that this contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (K), and that this Court has constitutional authority to enter a final judgment in this matter.

## PROCEDURAL HISTORY

On November 10, 2014, David Kadoch (the "Debtor") filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code (doc. # 1). On December 8, 2014, creditor Laurie Kadoch (hereafter "Ms. Kadoch") filed an objection to the Debtor's claim of exemptions with supporting memorandum of law (doc. ## 22, 23). On December 11, 2014, creditor Esther Clenott (hereafter "Ms. Clenott" or collectively with Ms. Kadoch, the "Creditors") filed an objection to the Debtor's claim of exemptions (doc. # 33) (hereafter, these two objections to the Debtor's homestead exemption are collectively referred to as "the Objections").

The parties filed a joint notice of evidentiary hearing on December 11, 2014 (doc. # 35). Over the course of the next month, Ms. Kadoch filed a supplemental memorandum in support of her objection to exemption, the Debtor filed a response to Ms. Clenott's objection, Ms. Kadoch filed a reply to the Debtor's response to Ms. Clenott's objection, and the Debtor filed a response to Ms. Kadoch's objection to exemption (doc. ## 42, 44, 45, 47).

On January 14, 2015, the Debtor filed a notice of voluntary conversion from Chapter 13 to Chapter 7, and the next day the Court entered an order converting the case to Chapter 7 (doc. ## 48, 49).

On January 20, 2015, Ms. Kadoch filed a reply to the Debtor's response to Ms. Kadoch's objection to exemption (doc. # 53).

On January 23, 2015, the Court conducted an evidentiary hearing on the Objections, at which the Court found certain facts to be material and undisputed. Based on those facts, the Court entered an oral ruling sustaining the Creditors' Objections. However, on January 28, 2015, the Court entered an order <u>sua sponte</u> vacating its oral ruling based upon its discovery of case law that raised issues which might have influenced the Court's decision in the case, had they been squarely addressed by the parties. In its January 28, 2015 order, the Court directed the parties to file additional memoranda of law and appear for a continued hearing on March 6, 2015 (doc. # 57).

Pursuant to the Court's Order, each of the Creditors filed a memorandum of law in support of her objection, the Debtor filed a memorandum of law in support of his claimed homestead exemption, and each of the Creditors filed a reply to the Debtor's memorandum of law (doc. ## 65, 66, 68, 71 and 72).

After considering the parties' expanded legal arguments, the Court entered an oral ruling at the March 6, 2015 hearing, overruling the Objections and further ruling that the Debtor's homestead exemption is effective as to Ms. Clenott's debt and thus bars the enforcement of that debt against the Property. This memorandum of decision is issued to further articulate the Court's rationale and memorialize the bench ruling it made at the March 6th hearing.

### Undisputed Material Facts

Based on its review of the parties' pleadings, the record in the case, and the parties' stipulation to certain facts, the Court finds the following facts to be material and undisputed:

(1) The Debtor and his former spouse purchased real property located at 2024 Main Street, Quechee, Vermont in 2002 (the "Property").

(2) The Debtor recorded the deed to the Property shortly thereafter, in 2002.

(3) From the date of purchase, it was the Debtor's intent to make the Property his homestead.

(4) The Property needed significant renovations.

(5) Between October 2004 and July 2005, Ms. Clenott loaned the Debtor and Ms. Kadoch $200,000, through a series of advances, to renovate the Property.

(6) Through July 2005, the Debtor resided at Salt Box Road and that property was his homestead.

(7) The Debtor did not abandon his homestead interest in the Salt Box Road property during the period of renovations.

(8) In late 2005 or early 2006, the Debtor began residing at the Property.

(9) In 2006, the Debtor filed the requisite state tax declaration that the Property was his homestead.

(10) On June 21, 2010, the family court entered a divorce decree, based upon a stipulation between the Debtor and Ms. Kadoch, which directed the Debtor to sell the Property and directed the Debtor and Ms. Kadoch to each pay one-half of Ms. Clenott's debt (the "Divorce Decree").

(11) On October 18, 2010, with the consent of the Debtor, the state court granted judgment in the amount of $208,090.83, in favor of Ms. Clenott against the Debtor (the "Clenott Judgment").

(12) On July 10, 2014, the family court entered an order (a) finding the Debtor in contempt of the Divorce Decree, based upon his failure to sell the Property, and (b) appointing a receiver to sell the property (the "Contempt Order").

(13) As of the date of the Debtor's bankruptcy filing on October 10, 2014, the Debtor had neither sold the Property nor paid the debt owed to Ms. Clenott.

(14) As of the date of the bankruptcy filing, the Property was subject to a first mortgage in the approximate amount of $311,000.

### Issues Presented

This contested matter raises numerous intertwined legal issues: First, did the Debtor's filing of the instant bankruptcy case relieve him of the Divorce Decree obligation to pay Ms. Clenott from his share of the net sale proceeds of the Property? Second, does the Divorce Decree prevent the Debtor from claiming a homestead exemption, or from invoking the homestead exemption as a bar to the enforcement of Ms. Clenott's debt? Third, did the family court's Contempt Order change the parties' rights in the Property?

Fourth, does the fact that the Debtor consented to entry of the judgment in favor of Ms. Clenott affect his right to avoid that judgment under federal bankruptcy law? Fifth, does the Debtor have equity in the Property to which his claimed homestead exemption can attach? Sixth, did the Debtor acquire his ownership interest in the Property subject to a pre-existing debt owed to Ms. Clenott? Seventh, what rights does each of the parties currently have in the Property? Eighth, if the Property is sold (as required by the Divorce Decree), how must the sale proceeds be distributed in light of the bankruptcy filing?

<u>DISCUSSION</u>

1. <u>Did the Debtor's filing of the instant bankruptcy case relieve him of the Divorce Decree obligation to pay Ms. Clenott from his share of the net sale proceeds of the Property?</u>[1]

The Divorce Decree included four provisions particularly pertinent to this disputed matter: (1) it awarded the Property to the parties equally as tenants in common;[2] (2) it declared certain debts, including Ms. Clenott's debt, to be joint debts of the Debtor and Ms. Kadoch; (3) it directed the Debtor sell the Property; and (4) it directed that proceeds from the sale of the Property be used to pay certain enumerated joint debts, including Ms. Clenott's debt. None of the parties challenge any portion of the first three of these salient provisions. Rather, the dispute centers on whether the Debtor's filing of the instant bankruptcy case relieved him of the obligation of paying Ms. Clenott from his share of the net sale proceeds of the Property, as directed by the Divorce Decree. Whether the Debtor may claim a homestead exemption in the Property is at the crux of this issue – and many of the issues – raised in this case. If the Debtor may not claim a homestead exemption in the Property, then Ms. Clenott would be able to enforce her debt against the Debtor's net sale proceeds,[3] and any remaining net proceeds from the sale of his interest in the Property would be paid over to the bankruptcy case trustee for distribution to creditors. If, on the other hand, the Debtor may claim a homestead exemption, the Debtor's exemption would protect his portion of the net sale proceeds from the claims of creditors, up to the amount of his allowed exemption.

The Creditors characterize the Debtor's claim of a homestead exemption in bankruptcy as an attempt to appeal or relitigate the family court's directive that he pay certain creditors from his share of

---

[1] The family court entered a "Final Divorce Findings and Order" on May 11, 2010 (doc. # 65-1, pp. 19-41) as well as a "Final Divorce Decree" on June 21, 2010 (doc. # 65-1, pp. 1-3). There are no material differences in the ordering provisions of the two orders. However, the "Final Divorce Findings and Order" contains additional detail useful to this Court's interpretation of the Divorce Decree, including a chart setting forth in greater detail the state court's distribution of the marital debt and assets.

[2] Neither the Divorce Decree nor the chart in the "Final Divorce Findings and Order" explicitly awards the Property to both parties equally as tenants in common. However, in both the Divorce Decree and the "Final Divorce Findings and Order" the family court specified those debts and assets it assigned individually. It did not assign the Property to the Debtor or Ms. Kadoch individually, and a division of the Property equally to the parties as tenants in common conforms to the family court's treatment of other jointly owned assets and debts. Moreover, no party in the instant proceeding has asserted the family court distributed the Property otherwise.

[3] This assumes Ms. Clenott's judgment lien on the property is valid, which, for reasons discussed below, this Court does not determine.

4

the net proceeds from the sale of the Property. They argue this is prohibited by the <u>Rooker-Feldman</u>

doctrine,[4] and the Debtor should be required to distribute his net proceeds from sale of the Property

pursuant to the distribution mandated by the Divorce Decree, notwithstanding his bankruptcy filing. The

Debtor counters that his relationship with – and duty to – his creditors, including Ms. Clenott, is governed

by federal law, post-bankruptcy. Essentially, the Debtor asserts that federal law pre-empts the family

court's Divorce Decree directive regarding payment of his creditors.

      The Debtor is correct that the treatment of claims against him, as well as the nature and priority of

those claims, must be determined by this Court and is governed by the distribution scheme detailed under

federal law in Title 11 of the United States Code (the Bankruptcy Code).

> [S]ince the state matrimonial court is the only forum competent to adjudicate
> the respective responsibilities, obligations and property entitlement of the parties
> before it, <u>to the extent that its pronouncements do not affect property of the estate or
> dischargeable obligations of the debtor</u>, we will not interfere with that court's
> customary processes.
>
>     It is with the distribution of property of the estate as defined in 11 U.S.C. §
> 541(a), however, that the federal question arises. <u>28 U.S.C. § 1334 gives the district
> court exclusive jurisdiction over both property of the estate and property of the
> debtor</u>.
>
>     [...]
>
>     [W]hile the adjudication of all rights, duties, and entitlements as between the
> debtor and the spouse are within the exclusive province of the state matrimonial
> court, <u>it is within the exclusive province of the bankruptcy court to adjudicate the
> rights of creditors as against property of the debtor and property of the estate</u>.

<u>In re Palmer</u>, 78 B.R. 402, 406 (Bankr. E.D.N.Y. 1987) (emphasis added); <u>see</u> <u>Ridgway v. Ridgway</u>, 102

S. Ct. 49, 55 (U.S. 1981) ("[A] state divorce decree, like other law governing the economic aspects of

domestic relations, must give way to clearly conflicting federal enactments,"). Bankruptcy law controls

the characterization and treatment of debts:

>     The discharge of a debt by a bankruptcy court is similarly an <u>in rem</u>
> proceeding. Bankruptcy courts have exclusive jurisdiction over a debtor's property,
> wherever located, and over the estate. In a typical voluntary bankruptcy proceeding
> under Chapter 7, the debtor files a petition for bankruptcy in which he lists his debts
> or his creditors, Fed. R. Bankr. P. 1007(a)(1); the petition constitutes an order for
> relief, 11 U.S.C. § 301. The court clerk notifies the debtor's creditors of the order for

---

[4] "Under the <u>Rooker-Feldman</u> doctrine, lower federal courts lack subject-matter jurisdiction over claims that effectively
challenge state-court judgments." <u>Wilson v. Deutsche Bank Nat'l Trust (In re Wilson)</u>, 410 Fed. Appx. 409, 410 (2d Cir. 2011)
(citing <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 486-87, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983);
<u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 415-16, 44 S. Ct. 149, 68 L. Ed. 362 (1923). "After the doctrine was modified by
the Supreme Court in <u>Exxon Mobil Corp. v. Saudi Basic [Indus.] Corp.</u>, 544 U.S. 280, 125 S. Ct. 1517, 161 L. Ed. 2d 454
(2005), [the Second Circuit] held that there are four requirements that must be met before the <u>Rooker-Feldman</u> doctrine may
apply: (1) 'the federal-court plaintiff must have lost in state court;' (2) 'the plaintiff must complain of injuries caused by a state-
court judgment;' (3) 'the plaintiff must invite district court review and rejection of that judgment;' and (4) 'the state-court
judgment must have been rendered before the district court proceedings commenced.' <u>Id.</u> (quoting <u>Hoblock v. Albany Cnty.
Bd. of Elections</u>, 422 F.3d 77, 85 (2d Cir. 2005)).

relief, see Rule 2002(l), and if a creditor wishes to participate in the debtor's assets, he files a proof of claim, Rule 3002(a); see 11 U.S.C. § 726. If a creditor chooses not to submit a proof of claim, once the debts are discharged, the creditor will be unable to collect on his unsecured loans. Rule 3002(a); see 11 U.S.C. § 726. The discharge order releases a debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt and by operating as an injunction to prohibit creditors from attempting to collect or to recover the debt. §§ 524(a)(1), (2).

Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (U.S. 2004) (internal citations and quotations omitted).

The family court determined the Debtor's rights and obligations in debts and assets the Debtor and his spouse shared, specifically determining how the two parties would divide the debts and assets between them. However, once the Debtor commenced a bankruptcy case, liability for the debts he owed – whether sole or joint, and whether by virtue of his own actions or imposed upon him by the Divorce Decree – were all subject to discharge in his bankruptcy case unless specifically excepted from discharge by the Bankruptcy Code.[5] See In re Brody, 3 F.3d 35, 38 (2d Cir. N.Y. 1993); Jarvis v. Jarvis (In re Jarvis), 2004 Bankr. LEXIS 2517, *8-11 (Bankr. D. Vt. Dec. 2, 2004); In re Freyer, 71 B.R. 912, 917 (S.D.N.Y. 1987). Since there is no allegation, argument, or evidence before the Court to indicate any of the joint debts enumerated in the Divorce Decree are properly excepted from discharge, the Debtor may discharge his personal liability for the obligations allocated to him in the Divorce Decree, including his debt to Ms. Clenott.

Therefore, the Debtor's filing of a bankruptcy case may relieve him of the obligation to pay Ms. Clenott from the Property sale proceeds, and whether and when he must pay Ms. Clenott will be determined by federal law.

2. Does the Divorce Decree prevent the Debtor from claiming a homestead exemption or from invoking the homestead exemption as a bar to the enforcement of Ms. Clenott's debt?

The Creditors argue the Divorce Decree prevents the Debtor from claiming a homestead exemption in the Property at all, or alternatively, from invoking the homestead exemption to bar Ms. Clenott from enforcing her debt against that real estate. "Pursuant to 11 U.S.C. § 522(b), debtors may exempt certain property from the bankruptcy estate created by the petition, 'allowing them to retain those assets rather than divide them among their creditors.'" CFCU Cmty. Credit Union v. Hayward, 552 F.3d 253, 258 (2d Cir. N.Y. 2009) (quoting Rousey v. Jacoway, 544 U.S. 320, 322, 125 S. Ct. 1561, 161 L. Ed. 2d 563 (2005)). "Debtors may exempt 'any property that is exempt under . . . State or local law that is applicable on the date of the filing of the petition …'" Id. (quoting 11 U.S.C. § 522(b)(3)(A)). Here, the

---

[5] For example, § 523(a)(5) excepts domestic support obligations from discharge. No party here has asserted the Debtor's debt to Ms. Clenott is in the nature of a domestic support obligation, or entitled to the status of a priority unsecured claim under the Bankruptcy Code.

Debtor is claiming a state law homestead exemption, which would extend to the proceeds of the sale of the Property. See In re Greene, 451 B.R. 331, 339 (Bankr. D. Vt. 2011) (interpreting 12 V.S.A. § 3023 and 27 V.S.A. § 101 as extending homestead exemption to proceeds of sale of homestead).

The Creditors advance three arguments as to why, under state law, the Divorce Decree prevents the Debtor from exempting the Property. First, the Creditors assert the Divorce Decree, which was recorded pre-petition, was a conveyance and creates a lien on the Property pursuant to 15 V.S.A. § 754.[6] That statute provides:

> A certified copy of the judgment, or relevant parts thereof, when recorded in the land records of the town in which real estate of the parties is located, shall be effective to convey or encumber the real estate in accordance with the terms of the judgment, as if the judgment were a deed. A property transfer return shall be filed with the judgment, but the transfer shall be exempt from the taxes imposed by chapters 231 and 236 of Title 32 to the extent of the property interests conveyed to either of the parties.

15 V.S.A. § 754 (emphasis added). Since the Divorce Decree directed payment of the parties' joint debts, including the debt to Ms. Clenott, the Creditors argue the recording of the Divorce Decree created a mortgage securing the payment of this joint marital debt. This argument fails. Vermont Supreme Court law is clear that "Section 754 creates an encumbrance only in accordance with the terms of the judgment." Sumner v. Sumner, 2004 VT 45, ¶ 10 (Vt. 2004) (internal quotations and citations omitted). The Vermont Supreme Court in Sumner cited favorably to Bryan v. Nelson, 180 Ariz. 366, 884 P.2d 252, 254 (Ariz. Ct. App. 1994) in which the Arizona state court held that where the subject divorce decree included a provision guaranteeing the plaintiff would be paid out of the proceeds of a sale, but did not specifically state it was creating a lien, the court would not impute the creation of a lien based solely upon the language of the recording statute. That is precisely the scenario here. The Divorce Decree only directed that the parties' joint debts be paid from the proceeds of the sale of the Property. It did not say anything about security for that obligation. There is no indication the family court intended to grant a lien on the Property in favor of any creditor to secure payment of the debts. Based upon the rationale of Sumner and Bryan v. Nelson, this Court concludes the Divorce Decree did not create a lien in favor of Ms. Clenott.

The Creditors' second argument is that by ordering the Property to be sold, the proceeds to be distributed, and any excess proceeds to be divided equally between the parties, the Divorce Decree extinguished the Debtor's state law right to claim a homestead exemption in the Property, or its proceeds, prior to satisfying the joint debts. As a corollary to this, the Creditors argue that the Debtor's obligation to sell the Property carried with it an abandonment of his homestead interest, based upon this Court's ruling in In re Bernstein, 62 B.R. 545, 548 (Bankr. D. Vt. 1986).

---

[6] The Creditors also advance an identical argument with respect to the state court's Contempt Order. The Contempt Order is discussed separately below.

7

Neither aspect of this argument is persuasive. There is no language in the Divorce Decree extinguishing (or even addressing) the Debtor's homestead rights in the Property or its proceeds. The Divorce Decree provisions concerning distribution of proceeds to joint creditors and distribution of excess proceeds to the Debtor and Ms. Kadoch address the sale of "the three parcels of real estate," two of which were not the Debtor's homestead. While Vermont Supreme Court jurisprudence provides that "absent some special provision therein, the final judgment in a divorce proceeding terminates a homestead right," this statement appears aimed at a party who no longer resides (or no longer has an ownership interest in) the homestead property, and not at a party who retains uninterrupted possession and ownership of the homestead property. Condosta v. Condosta, 142 Vt. 117, 122 (Vt. 1982) (citing Heaton v. Sawyer, 60 Vt. 495, 499-501, (1888)); see also T.J. Oliver, Annotation, Effect of divorce on homestead, 84 A.L.R.2d 703, § 4 (citing Condosta in support of the proposition that "the husband's homestead rights in the wife's separate property are terminated where the divorce decree makes no disposition of homestead rights"). This holding must also be interpreted in light of broader case law addressing termination of homestead rights. In In re Mead, 489 B.R. 363, 372 (Bankr. D. Vt. 2013), this Court summarized Vermont homestead law on this question as follows:

> Once a property has become a homestead, it can lose its character only through death, alienation, or abandonment. Typically, the homestead is abandoned when the debtor either sells the property or establishes a new homestead. When a homestead is no longer used as a homestead, however, regardless of whether another homestead has been acquired, the homestead has ceased to exist.

Id. (internal citations and quotations omitted). Black's Law Dictionary defines alienation as "[c]onveyance or transfer of property to another." Black's Law Dictionary (10th ed. 2014). Divorce courts regularly effect alienations of property, such as when they direct conveyance of a jointly owned marital residence to one party. In that event, the transferor spouse no longer retains any ownership or possessory interest in the property and loses his or her homestead right. There is no Vermont case law to support application of that rationale to terminate the homestead interest of the transferee spouse who retains both an ownership and possessory interest in the homestead property, as is the case here.

Moreover, in the absence of an explicit statement to the contrary in the Divorce Decree, or binding precedent addressing similar facts, this Court is not persuaded the family court intended to abrogate the Debtor's homestead rights vis-a-vis third party creditors. Those creditors were not parties to the divorce proceeding. See Barrup v. Barrup, 2014 VT 116, ¶ 16 (Vt. 2014) (specifying rules of Vermont Civil Procedure under which third party may seek to intervene in divorce action). At least one Vermont Supreme Court justice has cautioned against allowing intervention of third party creditors in divorce actions, describing it as contrary to both the ordinary purpose of a divorce proceeding and the Vermont statute delineating the exclusive jurisdiction of the family court division, 4 V.S.A. § 33 (formerly codified

8

as 4 V.S.A. § 454). <u>See</u> <u>Barrup v. Barrup</u>, 2014 VT 116 at ¶¶ 34-41 (Skoglund, J., concurring); <u>accord</u> 1-3 <u>Collier Family Law and the Bankruptcy Code</u> P 3.02 (Henry J. Sommer & Margaret Dee McGarity, eds., 2014) (noting that only under extremely rare circumstances is a creditor or other non-spouse person a party to a divorce); <u>see also</u>, generally, <u>Gemza v. Rogan (In re Rogan)</u>, 283 B.R. 643, 648 (Bankr. D. Conn. 2002) (expressing doubt that a dissolution court has the power to alter the nature of one or both spouses' relationships with a third party creditor). The purpose of a divorce proceeding is to allocate assets and debts between the two divorcing parties, not adjudicate the rights of third party creditors. The generally accepted tenet about the impact of divorce on the spouses' creditors is that a "divorce court assigns responsibility for payment of particular debts, but this assignment does not affect which spouse is personally obligated to the creditor. The creditor can use any remedies it had before the divorce to recover from either liable spouse." 1-3 <u>Collier Family Law and the Bankruptcy Code</u> P 3.02. Against this backdrop, and cognizant that the homestead statute should be liberally construed in favor of debtors, <u>see</u> <u>Mercier v. Partlow</u>, 149 Vt. 523, 524 (Vt. 1988), the Court is not persuaded the Divorce Decree, issued in a proceeding involving only the Debtor and Ms. Kadoch, may be properly interpreted or applied to abrogate the Debtor's homestead rights against Ms. Clenott – a non-intervening third party creditor.

Likewise, the Creditors' argument that the Debtor abandoned his homestead, based upon the holding in the <u>Bernstein</u> case, is without merit. Here, the Divorce Decree specifically provides for the Debtor to have sole occupancy of the Property until it is sold, and there is no dispute that the Debtor continued to reside in the Property as his homestead through and after the date he filed his bankruptcy petition. In <u>In re Bernstein</u>, this Court (Conrad, J.) held that "[a debtor's] clear intent to sell, in the future, without more, cannot establish a present abandonment of her homestead." <u>In re Bernstein</u>, 62 B.R. at 549. Finding that "[t]he debtor resided in her homestead on the date her petition was filed and had not yet acquired a new homestead," this Court rejected the argument that the debtor had abandoned her homestead. <u>Id.</u> at 549-50. So, too, here. The state court directive that the Debtor sell the Property is not the legal equivalent of an abandonment of the homestead by the Debtor.

The Creditors' third argument is that through either issue preclusion or claim preclusion the Debtor is estopped from asserting a homestead exemption against Ms. Clenott because the Debtor failed to assert his homestead rights in the divorce proceeding. Both preclusion arguments fail. The divorce proceeding involved only the Debtor and Ms. Kadoch, and took place in an entirely different context from a debt enforcement action. As addressed above, the Debtor's homestead rights vis-a-vis third party creditors was not an issue litigated or decided in the divorce proceeding; the debts were adjudicated in the divorce solely for the purpose of allocating liability between the Debtor and Ms. Kadoch. Additionally, the Vermont Supreme Court has stated "[t]he homestead exemption does not apply in the context of a

divorce" because "[i]f the homestead exemption were to apply to the division of marital property, the language [of the pertinent Vermont statute] that 'all property owned by either or both of the parties, however and whenever acquired, shall be subject to the jurisdiction of the [divorce] court' for division, regardless of ownership or title, would be contravened." Pearson v. Pearson, 169 Vt. 28, 36-37 (Vt. 1999).[7] There was therefore no reason the Debtor should have raised – and nothing in the record indicates that he did raise – his homestead rights in the divorce proceeding. This Court will not impute a waiver of the Debtor's homestead rights based on his failure to assert them in the divorce proceeding where they were not at issue.

In sum, notwithstanding the language in the Divorce Decree that the Debtor and Ms. Kadoch were to pay Ms. Clenott's debt from the net sale proceeds, the Divorce Decree did not elevate Ms. Clenott's right to enforce her debt above other creditors, modify the character of her debt, or preclude the Debtor from claiming the Property exempt as his homestead, either generally or as a bar to Ms. Clenott's enforcement of her debt.

3. Did the family court's Contempt Order change the parties' rights in the Property?

Most of the Creditors' arguments regarding the effect of the Contempt Order on the Debtor's homestead rights are identical to those they raise with respect to the Divorce Decree. Those arguments fail, for the same reasons articulated above.[8]

Although the parties do not address it, the Court finds the language of the Contempt Order to be instructive. The Contempt Order does not direct the receiver to pay the sale proceeds from the sale of the Property to the joint creditors. Rather, it merely provides that "[u]pon sale of the [P]roperty, the receiver shall equally disburse the net proceeds between the parties [to the divorce]." This language undermines the Creditors' position that the Divorce Decree created a lien securing payment of the joint debts, and supports the Debtor's position that the Divorce Decree simply divided responsibility for payment of the joint debts between the spouses.

The Creditors advance one argument specific to the Contempt Order: that appointment of the receiver to sell the Property stripped the Debtor of his authority over the Property, required him to abandon the Property, and hence extinguished his homestead rights in the Property. That argument is unavailing. Their leap to this conclusion is not supported by the facts or law. The Contempt Order has no provision which alters the Divorce Decree's distribution of the Property or its proceeds, or refers to the

---

[7] It is unclear whether the Vermont Supreme Court's holding in Pearson is applicable to third party creditors, given that in Pearson, the Vermont Supreme Court affirmed the family court's placement of a lien on an ex-wife's homestead property in favor of an ex-husband (rather than a lien in favor of a third party). However, the Court need not determine the scope of Pearson because, as stated above, the family court here did not provide any lien securing payment of the joint debts, and there is no indication the family court intended to abrogate the Debtor's homestead rights vis-a-vis third party creditors in later proceedings such as, e.g., a collection action.
[8] See section 2, supra.

Debtor's rights and interests in the Property.  Rather, the only change to the Divorce Decree which the Contempt Order makes is to nullify the directive that the Debtor control the sale. The Contempt Order does not direct the Debtor to vacate the Property or abandon any aspect of his interest in the Property. And, the record is unequivocal that the Debtor remained in possession of the Property, without objection of any party, after entry of the Contempt Order. The Creditors have not pointed to anything in the Contempt Order, nor any pertinent law, to support their assertion that the Contempt Order altered the Debtor's tenant in common interest in the Property, effectuated the Debtor's abandonment of the Property, or extinguished the Debtor's right to claim a homestead exemption in the Property.

Therefore, the Court finds the only impact the Contempt Order had on the parties' rights in the Property was to extinguish the Debtor's duty and authority to sell the Property pursuant to the Divorce Decree.  It categorically did not diminish the Debtor's homestead rights, nor enhance the rights of creditors claiming an interest in the Property.

4. What is the effect of the consensual judgment in favor of Ms. Clenott?

Since the Debtor consented, in state court, to entry of the Clenott Judgment, the Creditors argue the Debtor may not assert homestead rights against Ms. Clenott's enforcement of her debt.

The Debtor asserts the Clenott Judgment was not validly recorded, and therefore, is not a valid lien. The Creditors vehemently contest that. However, the Court need not determine the validity of the Clenott judgment lien at this time for two reasons.[9] First, even if the lien is valid, the Creditors' argument that the Clenott Judgment prevents the Debtor from asserting his homestead rights fails. The Clenott Judgment, like the Divorce Decree, contains no provision abolishing, or even addressing, the Debtor's homestead rights. The Debtor's consent to entry of the Clenott Judgment bars the Debtor from disputing his liability for, or the validity of, Ms. Clenott's debt. That is all. Ms. Clenott's ability to collect that debt from the Debtor, and the Debtor's right to invoke his homestead exemption against her collection efforts, are entirely distinct matters. See Mercier v. Partlow, 149 Vt. at 526-527 (recognizing judgment liens have been uniformly held to be subject to the homestead exemption). This conclusion is further supported by the "Stipulated Order of Approval" entered in the state court action, which ordered "nonpossessory attachment of the nonexempt real property of the [Debtor]"[10] (emphasis added). Attached to the "Stipulated Order of Approval" is a list of potentially pertinent exemptions, which includes a debtor's homestead under 27 V.S.A. § 101. For these reasons, the Creditors' argument that the Debtor's acquiescence to entry of the Clenott Judgment in the state court forecloses the Debtor from now asserting his homestead rights against its enforcement is without merit.

[9] The question of the validity of the Clenott judgment lien is not properly before the Court since the Debtor has not initiated an adversary proceeding. See Federal Rule of Bankruptcy Procedure 7001.
[10] The "Writ of Attachment" entered in the same action similarly provides for attachment of nonexempt goods or estate.

11

Case 14-10552   Doc    79   Filed 04/03/15   Entered    04/03/15 10:54:05
Desc    Main Document       Page    12 of 18

Second, even if the Debtor had waived his homestead rights in the state court action by consenting to entry of the Clenott Judgment, then that waiver would not be enforceable in this bankruptcy case. The fact that the Debtor consented to entry of the Clenott Judgment does not alter its character as susceptible to avoidance under § 522(f) of the Bankruptcy Code, if that judgment impairs the Debtor's homestead exemption. "Under § 522(f), bankruptcy courts have addressed whether a consent judgment or a confession of judgment results in a 'judicial lien' or a 'security interest.' The nearly unanimous conclusion is that a judicial lien results and that such liens may be avoided under § 522(f)." Berman v. Forti, 232 B.R. 653, 657 (D. Md. 1999). If the Debtor avoids the Clenott Judgment, Ms. Clenott would retain only an unsecured claim in this case. Then, § 522(e) would apply, and it, in turn, provides that "[a] waiver of an exemption executed in favor of a creditor that holds an unsecured claim against the debtor is unenforceable in a case under this title with respect to such claim against property that the debtor may exempt under subsection (b) of this section." 11 U.S.C. § 522. When §§ 522(e) and (f) are read together one reaches the conclusion that the "judicial lienholder should be viewed as a 'creditor that holds an unsecured claim' for purposes of 11 U.S.C. § 522(e)," and a waiver of an exemption in favor of that judicial lienholder is unenforceable pursuant to § 522(e).[11] In re D'Italia, 507 B.R. 769, 774 (Bankr. D. Mass. 2014). Thus, the Court concludes that, even assuming arguendo the Debtor voluntarily waived his homestead rights in the state court proceeding, that waiver would be unenforceable in this case, if the Debtor seeks to avoid the Clenott Judgment lien. See In re D'Italia, 507 B.R. at 774; see also In re Hebert, 301 B.R. 19 (Bankr. N.D. Iowa 2003).

Thus, notwithstanding the Debtor's consent to entry of the Clenott Judgment, that judgment shall be treated the same as any other judgment in a bankruptcy case, and subject to whatever homestead rights the Debtor is eligible to claim in this case.

5. Does the Debtor have equity in the Property to which a homestead exemption may attach?

The Creditors argue that, regardless of this Court's determination of their rights under the Divorce Decree, the Contempt Order, or the Clenott Judgment, the Debtor cannot claim a homestead exemption for the simple reason that he has no equity in the Property to which a homestead exemption could attach. They posit that, under Mercier v. Partlow, 149 Vt. at 525-526, the homestead is part of the defendant's equity of redemption and not part of the value subject to a mortgage, and the Property has no value above the balance due on the mortgage. There is some uncertainty as to the actual fair market value of the Property. However, there appears to be a consensus that the Property is worth between $400,000 and

---

[11] Of course, this is only true, as stated above, to the extent the Debtor may (but for a waiver) properly assert a homestead exemption under the applicable exemption statute.

12

$528,500.[12] Based on that range of values, the Debtor's 50% interest in the Property has a fair market value of between $200,000 and $264,250. Relying on In re Norton, 327 B.R. 193, 198 (Bankr. D. Vt. 2005), the Creditors contend that the whole amount of the $311,000 joint mortgage debt encumbers the Debtor's 50% interest in the Property, leaving no equity to which the Debtor's homestead exemption claim may attach.

In Norton, this Court held, based on the legal fiction of joint and several liability, "the entire liability encumbers each co-owner's separate interest and only the portion of each half-interest that is not encumbered by the debt is each owner's equity and hence, subject to exemption." Id. However, the Court in Norton acknowledged that "the inclusion of the full debt against each half-interest is inconsistent with the reality of what would happen if the property were sold, in that a sale of the property would require satisfaction of the mortgage debt just once," because "payment or satisfaction of the debt [...] terminates the legal fiction created by joint and several liability." Id. For this reason, the Court in Obuchowski v. Kleinfeldt (In re Kleinfeldt), 2007 Bankr. LEXIS 2521, *9-12 (Bankr. D. Vt. July 23, 2007) held "if [a] [p]roperty is to be sold, and the homestead exemption is to be computed in the context of allocation of the sale proceeds, the legal fiction of the joint and several liability of each co-tenant is dissolved and the Court must compute the allocation of net proceeds from a single pot." The Property in the case at bar is to be sold, so the Kleinfeldt analysis controls. Consequently, the Court calculates the equity available to the Debtor for purposes of a homestead exemption by subtracting the mortgage balance of $311,000[13] from $400,000 (the value most favorable to the Creditors for purposes of their instant argument). This results in an equity figure of $89,000, or $44,500 per spouse, to which the Debtor's homestead exemption could attach.

Based upon the applicable case law and corresponding calculations, the Creditors' argument that the Debtor is not entitled to a homestead exemption, due to a lack of equity in the Property, fails.

6. Did the Debtor acquire the Property subject to a pre-existing debt owed to Ms. Clenott?

Finally, the Creditors argue even if the Debtor is eligible to claim a homestead exemption in the Property, the Debtor is prohibited by state law from invoking the homestead exemption as a bar to Ms. Clenott's enforcement of her debt. The general right to a homestead exemption in Vermont is set forth in 27 V.S.A. § 101:

> The homestead of a natural person consisting of a dwelling house, outbuildings, and the land used in connection therewith, not exceeding $125,000.00 in value, and owned and used or kept by such person as a homestead together with

---

[12]  In presenting their arguments, the parties have used $400,000 and $528,500 as the lowest and highest likely fair market value of the Property, respectively.

[13] At closing certain property taxes and closing costs will need to be paid, but based on the parties' representations at the March 6, 2015 hearing, the Court finds the amount of likely taxes and closing costs would not be sufficient to alter the Court's conclusion, based on the facts in the record, that there will be some net proceeds available to the Debtor.

the rents, issues, profits, and products thereof, shall be exempt from attachment and
execution <u>except as hereinafter provided</u>.

27 V.S.A. § 101 (emphasis added). Hence, unless otherwise provided in subsequent sections of Title 27 of
the Vermont Statutes, the Debtor's homestead is exempt from attachment and execution by creditors. The
Creditors argue that the section titled "Liability of homestead for debts" applies in this case, and allows
Ms. Clenott to enforce her debt against the Debtor's current homestead property, based upon the sequence
of events surrounding her loan. The statute she cites provides as follows:

> Such homestead shall be subject to attachment and levy of execution upon
> <u>causes of action existing at the time of acquiring the homestead</u>, except as otherwise
> provided in this chapter. For that purpose, <u>such time shall be the date of the filing of
> the deed of such homestead</u> in the proper office for the record of deeds.

27 V.S.A. § 107 (emphasis added). The Creditors posit that since the Debtor did not use the Property as
his homestead, and therefore did not "acquire his homestead," until after Ms. Clenott's loaned him money,
he acquired his homestead subject to attachment and levy of execution upon her debt. The salient question
this presents is: Must a debt have arisen prior to a borrower's acquisition of a property, or is it enough for
the debt to have arisen prior to the date the borrower begins to occupy that property as a homestead, in
order for the debt to be enforceable against that homestead property?

The Court briefly summarizes the undisputed facts germane to this question: The Debtor and Ms.
Kadoch acquired the Property and recorded the deed to the Property in 2002. It was always the Debtor's
intent to make the Property his homestead. Because the Property was essentially uninhabitable prior to the
completion of major renovations, the Debtor and Ms. Kadoch continued to occupy their then-homestead
property at Salt Box Road, until July 2005. After the Property was purchased, but before the Debtor and
Ms. Kadoch inhabited the Property as their homestead in 2005, the Debtor borrowed funds from Ms.
Clenott for the purpose of renovating the Property.

The Creditors' position is that "homestead" as used in § 107 must be read to have the same
meaning as it has in § 101, <u>i.e.</u>, "a dwelling house, outbuildings, and the land used in connection
therewith, not exceeding $125,000.00 in value, <u>and owned and used or kept by such person as a
homestead</u>..." (emphasis added), and go on to reason that (a) any debt incurred prior to the time the
Debtor used the Property as a homestead may be enforced against the Property, (b) there is no question
the Debtor did not use or keep the Property as his homestead until after he incurred the debt to Ms.
Clenott, and (c) therefore, he "acquired his homestead" subject to Ms. Clenott's debt.

The alternative interpretation of § 107, which the Debtor urges, is that "the homestead" and "such
homestead" are used in the latter part of § 107 as shorthand for "the property which is <u>presently</u> a
homestead." From the Debtor's perspective, as soon as a deed to property is recorded, regardless of
whether the property is at that time used or kept as a homestead, the time bar of § 107 goes into effect.

14

That bar shields the property from causes of action arising after that time, so long as the property is being used as a homestead at the time of the attempted enforcement. Because the Debtor acquired the Property before he incurred the debt to Ms. Clenott, and the Property is currently the Debtor's homestead, the Debtor insists the Property is exempt from enforcement of Ms. Clenott's debt.

Although the statute is not entirely clear, and there is logical support for both interpretations, the case law compels the Court to agree with the Debtor's interpretation of § 107. The Court begins with the premise "'that all language in a statute was drafted advisedly and that the plain and ordinary meaning of the language used was intended.'" In re Patterson, 482 B.R. 755, 762 (Bankr. D. Vt. 2012) (quoting State v. Fletcher, 2010 VT 27, ¶ 10, 187 Vt. 632, 635, 996 A.2d 213, 217 (2010)). Here, the legislature's use of "the homestead" and "such homestead" as shorthand for "the property" is perplexing, especially since the first use of the phrase in § 107, "[s]uch homestead shall be subject to attachment ...," clearly refers to the homestead as defined in § 101 and the latter use is tied to the recording of a deed. However, the Vermont Supreme Court has declared that the term "homestead" as used in this statute is intended to describe the aptness of the exemption on the date a creditor seeks to enforce a debt against the property, rather than the applicability of the exemption on the date the deed to the property is recorded:

> [t]he statute, by its terms, clearly exempts the homestead from attachment on all debts except such as have an existence at the time the deed thereof is left for record. The word "homestead" is evidently used in the statute with reference to the condition of the premises in that respect, at the time the attempt is made to attach or levy upon it, and not to its condition at the time the deed is left for record. Ordinarily the homestead is purchased and the deed recorded before the occupation commences, often a long time before. Men often own more than one place suitable for a homestead, and are at perfect liberty to change their homestead at pleasure. The statute was not intended to impose any restraint upon their doing so. The object of the legislature in this provision evidently was to prevent men, after they had obtained a credit, from putting their property into a homestead, and thus preventing their creditors from reaching it by attachment, and this object is fully accomplished by making it subject to all debts that existed prior to the purchase; and to make the period definite and always susceptible of proof, they fixed upon the period of the leaving of the deed for record, the town clerk being required by law, in all cases, to write upon all deeds, left for record, the time, day and hour, when they are so left.
>
> . . .
>
> If the legislature had intended to leave the homestead subject to attachment, on all debts existing at the time it was first occupied as such, language would have been used indicating such an intent.

West River Bank v. Gale, 42 Vt. 27, 31-32 (Vt. 1869) (emphasis added). Although the historical antecedent of § 107 which the Vermont Supreme Court interpreted in West River Bank was less succinct

than the current version,[14] there is nothing to indicate the current version is a deliberate departure from the principles set forth in West River Bank, rather than a product of modernization and re-codification. The Vermont Supreme Court continues to cite West River Bank as good law, specifically for the proposition that the legislative purpose of § 107 is satisfied by "making [the homestead] subject to all debts that existed prior to the purchase." Weale v. Lund, 2006 VT 66, ¶ 10 (Vt. 2006) (emphasis added) (quoting West River Bank v. Gale, 42 Vt. at 31).

In other words, the purpose of § 107 is to "[fix] the time at which existing causes of action shall make the homestead subject to attachment and levy of execution," by reference to the recording of the deed of the homestead. In re Soter, 26 B.R. 838, 840 (Bankr. D. Vt. 1983). The question of whether the property is presently the individual's homestead does not figure into this determination because § 107 "presupposes the existence of a homestead ... under § 101."[15] Id.

To read § 107 otherwise would necessarily lead to illogical conclusions. The only way the Creditors' proposed reading of § 107 would produce a sensible result is if the phrase "the deed of such homestead" referred to a deed, distinct from the deed recorded to transfer title, that designated the homestead status. But under Vermont law, there is no "homestead deed" to record.[16] The deed a party files "in the proper office for the record of deeds" is the deed executed at the time of acquisition of an interest in the property. The time when that occurs is the time when, for purposes only of § 107, the property becomes exempt from enforcement of subsequently incurred debts. Although this may produce the arguably counter-intuitive result of a homestead being deemed effective, under § 107, prior to the date the property is kept or used as a homestead under § 101, this interpretation is mandated by the second sentence of the statute, and the Vermont Supreme Court's interpretation of § 107.

Based on this Court's reading of § 107, there are two questions to answer in the instant case. The first question is whether the Property was, as of the petition date, the Debtor's homestead. The answer to that question is yes. On the petition date, the Debtor had an ownership interest in the Property and was

---

[14] As of 1869, the statute read as follows: "Such homestead shall be subject to attachment and execution, upon any contract that may be made, and for all matters and causes of action which may accrue, previous to, or at the time of the purchase of such homestead, etc., and the time when the deed to the owner of such homestead shall be left in the town clerk's office for record, shall be deemed the time of the purchase thereof for the purpose mentioned in this act." West River Bank v. Gale, 42 Vt. at 31 (citing Comp. Stat., chapter 65, § 6).

[15] In Brattleboro S&L Ass'n v. Hardie, the Vermont Supreme Court cited positively to Soter, albeit on a separate point of law, and stated in a footnote:

[b]ecause homestead law is invoked so frequently in the context of bankruptcy, we note that the federal bankruptcy court in this state has significant experience interpreting Vermont homestead statutes. Many significant precedents underlying our decision in this case come from that court. We find them to be well-reasoned and have generally chosen to follow them in this decision.

Brattleboro S&L Ass'n v. Hardie, 2014 VT 26, ¶ 6, n. 3 (Vt. 2014). The Court includes this reference because the Court finds it unlikely that the Vermont Supreme Court would have included this statement, immediately after explicitly discussing Soter, if it disagreed with Soter's other holdings, including those pertaining to the interpretation of § 107.

[16] Title 32 of the Vermont Statutes Annotated does envision a "homestead declaration," which is filed for tax purposes, but this concept postdates use of the phrase "deed of such homestead" and is not a deed.

16

occupying it. The second question is whether the deed to the property was recorded before Ms. Clenott's

cause of action arose? Again, the answer is, absolutely, yes. The parties acknowledge that the Debtor

recorded the deed to the Property in 2002 and that Ms. Clenott loaned money to the Debtor between 2004

and 2005. That is sufficient for this Court to conclude that § 107 prevents Ms. Clenott from attaching and

levying execution of her debt upon the Property.

Thus, the Court finds the Debtor did not acquire the Property subject to Ms. Clenott's pre-existing

debt.

### 7. What rights does each of the parties currently have in the Property?

Based upon its findings that neither the Divorce Decree nor the Contempt Order diminished the

Debtor's right to a homestead exemption, that the Debtor is entitled to a homestead exemption in the

Property, and that exemption specifically applies to Ms. Clenott's debt, the Court concludes (a) the Debtor

and Ms. Kadoch each hold a 50% interest in the Property, and its proceeds, as tenants in common, and (b)

Ms. Clenott has a valid debt against the Debtor, and if it is secured by a judgment lien that lien is subject

to avoidance under § 522(f) of the Bankruptcy Code.

### 8. If the Property is sold, how must the proceeds be distributed?

Upon sale of the Property, the mortgage, any property taxes, and any closing fees must be paid

first. The remaining net proceeds must be divided equally between the Debtor and Ms. Kadoch. The funds

distributed to the Debtor, up to the amount of $62,500[17] would be exempt under his homestead

exemption. Any net proceeds allocable to the Debtor beyond the maximum amount of his homestead

exemption would be property of the estate, to be distributed by the Chapter 7 trustee. The distribution of

Ms. Kadoch's funds is not an issue within the jurisdiction of this Court; state law will determine her

obligations under the Divorce Decree.

### CONCLUSIONS OF LAW

Based upon the foregoing analysis, the Court reaches the following conclusions.

First, the Divorce Decree's provision directing distribution of proceeds from the sale of the

Property does not prevent the Debtor from discharging his obligation to pay Ms. Clenott in the context of

his bankruptcy case. Whether, when and how much the Debtor must pay Ms. Clenott will be determined

by federal law.

Second, the Divorce Decree did not create a lien on the Property in favor Ms. Clenott. Rather, it

simply articulated that the Debtor and his former spouse jointly owe a debt to Ms. Clenott. Nor did the

---

[17] At the March 6, 2015 hearing, the parties appeared to disagree about the amount of the Debtor's homestead exemption. As no party has requested the Court rule on this issue, the Court assumes without deciding that the proper amount is $62,500, based on the Debtor's half interest as a tenant in common. See In re Norton, 327 B.R. at 196 (holding proportion of Vermont homestead exemption available to a debtor is equal to proportion of debtor's ownership interest in the homestead).

17

Divorce Decree extinguish the Debtor's homestead rights under state law. Furthermore, the Divorce Decree does not bar the Debtor from asserting a homestead exemption against Ms. Clenott in this bankruptcy case.

Third, the Contempt Order does not effect any change in the Debtor's possessory or ownership interests in the Property. As to the Debtor, the Contempt Order merely vacated the provision in the Divorce Decree authorizing and directing the Debtor to sell the Property, replacing it with a provision appointing a receiver to sell the Property. It did not abrogate the Debtor's homestead rights.

Fourth, the Court makes no determination as to the validity of the Clenott Judgment because its validity does not affect the Debtor's homestead rights or prevent the Debtor from asserting his homestead rights, notwithstanding his consent to entry of the Clenott Judgment.

Fifth, in computing the Debtor's equity in the Property, this Court's decision in Kleinfeldt, 2007 Bankr. LEXIS 2521, not Norton, 327 B.R. 193, controls, because the Property is to be sold. Applying the principles of Kleinfeldt to the facts of this case indicates there will be equity to which the Debtor's homestead exemption may attach.

Sixth, although § 107 of Title 28 of the Vermont Statutes is less than pellucid, the Vermont Supreme Court's interpretation of that provision persuades this Court that the Clenott Judgment is not enforceable against the Property because the Debtor acquired the Property prior to borrowing money from Ms. Clenott and the Property is now the Debtor's homestead.

Seventh, the Debtor has a one-half interest in the net proceeds of the sale of the Property and the Debtor and Ms. Kadoch are equally liable on the debt to Ms. Clenott. The validity of the Clenott Judgment on the Property is undetermined at this time, but if it is valid it appears subject to avoidance by the Debtor under § 522(f). The Court makes no determination as to the validity or extent of the Clenott Judgment as to Ms. Kadoch's interest in the Property as it is not properly before the Court at this time.

Eighth, upon sale of the Property, the mortgage, taxes and closing costs must be paid, after which the Debtor shall be entitled to one-half of the net proceeds up to the amount of his homestead exemption and the balance of the Debtor's portion, if any, shall be property of the bankruptcy estate, subject to distribution by the Chapter 7 trustee.

Accordingly, the Court overrules the Creditors' objections to the Debtor's claimed homestead exemption both generally and as against Ms. Clenott.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

April 3, 2015                                    Colleen A. Brown
Burlington, Vermont                              United States Bankruptcy Judge